UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

EVEREST INDEMNITY INSURANCE CO.,

        Plaintiff,

   v.                                      Civil No. 16-1064 (JNE/HB)
                                          ORDER

DAEIL RO,

        Defendant.

Plaintiff Everest Indemnity Insurance Co. ("Everest") brings this insurance dispute seeking a judicial declaration that no coverage is available under a policy that Everest issued to Ameriprise Financial Services, Inc. ("Ameriprise"). Compl. ¶¶ 1-2, 36. Defendant Daeil Ro ("Ro"), who was employed by the Minnesota-headquartered Ameriprise as a registered investment advisor based out of a Bellevue, Washington office, seeks coverage under the Everest-Ameriprise insurance policy (the "Policy") in connection with a lawsuit that a client filed against him in Washington state court, a case which is not yet finally resolved. Shortly after Everest filed this action, Ro filed a lawsuit in the Western District of Washington against Everest and a third party seeking a declaration that Ro is entitled to coverage under the Policy and asserting claims for damages flowing from, among other things, the defendants' alleged violation of Washington's Insurance Fair Conduct Act. *Ro v. Everest Indem. Ins. Co.*, No. 16-cv-664-RSL (W.D. Wash.).

Ro moves to dismiss this action for lack of personal jurisdiction, to dismiss or transfer for improper venue under 28 U.S.C. § 1391, to dismiss or transfer in deference to Ro's lawsuit in the Western District of Washington, or to transfer the case to that district under 28 U.S.C. § 1404(a). For the reasons set forth more fully below, the Court grants the motion to transfer in deference to the ongoing related litigation in Washington, and alternatively on the grounds that the District of

Minnesota is an improper venue for this declaratory judgment suit over insurance claims asserted by Ro in Washington arising from litigation in Washington state court.

### I.     Factual Background

In April 2015, one of Ro's clients, Fumitaka Kawasaki, sued Ro in a Washington state superior court.  *Kawasaki v. Ro*, 15-2-10562-1-KNT (Wash. Super. Ct.) ("Underlying Lawsuit"); Compl. Ex. B, Dkt. No. 1-2.  In the Underlying Lawsuit, Kawasaki alleged that in 2001 to 2002, when Ro was working as an investment advisor for a different firm, before he was hired by Ameriprise in 2012, Ro misleadingly convinced Kawasaki to invest in "sham" companies in South Korea that Ro controlled.  The complaint also alleged that when the Underlying Lawsuit was filed, Ro was employed by Ameriprise, and that Ro had transferred Kawasaki's retirement accounts to Ameriprise and continued to act as his financial advisor there.  When Kawasaki sought the return of his investments in 2013, Ro, while acting as his Ameriprise financial advisor, allegedly asked Kawasaki instead to reinvest the proceeds into projects in the United States.  Kawasaki is a Washington resident.  Compl. Ex. B ¶¶ 1-2, 51-58.

As an Ameriprise financial advisor and registered representative, Ro was based out of a Bellevue, Washington office.[1]  Ro Decl. ¶ 6, Dkt. No. 14.  His direct supervisor was in the Washington office, and Ro has never been to Minnesota; he is a Washington resident and citizen.  *Id.* ¶ 11-13.  He is licensed as a financial advisor in only Washington and Nevada, has never been licensed to provide financial services in Minnesota, and does not have any Minnesota clients.  *Id.* ¶¶ 4, 5, 7-9.  As an Ameriprise representative, pursuant to a Financial Advisor Agreement with Ameriprise, he was authorized to seek applications for Ameriprise-approved

---

[1] The Court uses the past tense because it has been informed that Ro's employment with Ameriprise recently ended.  Ro's counsel represented at oral argument that Ro continues to reside in Washington.

products and services in his territory.  Halvorson Decl. ¶¶ 3-4, Dkt. No. 17.  Each application was subject to acceptance or rejection by the Ameriprise corporate headquarters in Minnesota.  *Id.* ¶ 5.  The Ameriprise corporate office reviewed and approved many applications for Ro's clients.  *Id.* ¶¶ 6-7.  Ro also communicated with the Ameriprise headquarters relating to his clients' transactions and his employment, including sending dozens of emails and initiating nearly 400 phone calls.  *Id.* ¶ 9-10.

Ro declares that he became aware of his client Kawasaki's claim against him in 2014, when Kawasaki demanded the return of his investments, and that at that point, Ro notified Everest of the claim and sought coverage.  Ro Decl. ¶¶ 13-14.  Everest's claims administrator, a California-based company doing business as Lancer Claims Services ("Lancer"), denied coverage in May 2014.  *Id.* ¶ 15.  After the complaint in the Underlying Lawsuit was filed in April 2015, Ro again sought coverage, and again, in June 2015, Lancer responded for Everest, denying coverage under the Policy.  *Id.* ¶¶ 16-18.  Shortly thereafter, in July 2015, Ro's attorney replied to Lancer, asserting Ro's position that he is entitled to a defense and indemnity under the Policy and that Lancer's investigation and denial of coverage was unlawful under Washington law.  Raiter Decl. Ex. E, Dkt. No. 16-1.  That letter concluded with the assertion that "Mr. Ro is considering his legal options in light of Everest's refusal to defend the Kawasaki lawsuit," and requested that Everest mitigate damages by providing a defense.  *Id.*

In March 2016, the parties in the Underlying Lawsuit reached a settlement agreement.  Ro Decl. ¶ 19.  In a letter dated March 25, 2016, Ro's attorney notified Everest and Lancer of the agreement and of an upcoming hearing in the Underlying Lawsuit to determine the reasonableness of the settlement.  *Id.* ¶ 20.  In addition, the letter asserted that "Ro intends to assert a cause of action under [Washington's Insurance Fair Conduct Act] against Everest and

Lancer." Ro Decl. Ex. C at 2. It concluded, "Everest/Lancer has twenty days to respond to this notice," citing statutory provisions that require a plaintiff to provide written notice twenty days before filing an action and authorizing the plaintiff to bring the action without further notice if the insurer fails to resolve the basis for the action within that period. *Id.* at 7 (citing Wash. Rev. Code § 48.30.015(8) (2015)). In a letter dated April 15, 2016, counsel for Everest responded to Ro's March letter, denying all of the allegations in the letter, reiterating Everest's position that Ro is not entitled to coverage under the Policy, and inviting Ro to submit any additional information he wanted to be considered. Raiter Decl. Ex. I. On April 21, 2016, Everest filed a motion to intervene in the reasonableness hearing in the Underlying Lawsuit in Washington state court. Davis Decl. Ex. H, Dkt. No. 13.

On April 24, 2016, Everest, which is a Delaware corporation with its principal place of business in New Jersey, Compl. ¶ 12, filed its Complaint in this action. It alleges that Ro tendered the defense of the Underlying Lawsuit claims to Everest and sought coverage as an insured under the Policy. Compl. ¶ 7. It further alleges that the Policy was issued in Minnesota and acknowledges that it "provides coverage for the approved activities of Ameriprise's registered representatives," like Ro, subject to various exclusions, some of which Everest contends apply here. Compl. ¶¶ 25-26, 40. In the sole cause of action asserted in its Complaint, Everest seeks a judicial declaration that no coverage is available under the Policy for the claims asserted against Ro in the Underlying Lawsuit and that Everest therefore "properly declined Ro's request for defense and indemnity . . . ." Compl. ¶¶ 36, 40.

On May 9, 2016, Ro filed his complaint against Everest and Lancer in the Western District of Washington ("Ro Lawsuit"). *See* Davis Decl. Ex. I. He asserted the cause of action under Washington's Insurance Fair Conduct Act which his March 2016 letter had referenced,

4

plus additional counts relating to his coverage claims under the Policy relating to the Underlying Lawsuit. For example, he alleged that Everest and Lancer violated their duty of good faith and were negligent in investigating his coverage claim. *Id.* ¶¶ 40-44.

## II. Discussion

### A. Personal Jurisdiction

A party may move to dismiss claims for lack of jurisdiction over the person. Fed. R. Civ. P. 12(b)(2). To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff has the burden of making a prima facie showing that jurisdiction exists. *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591 (8th Cir. 2011); *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006). The Court should consider not only the pleadings, but also any affidavits and exhibits supporting or opposing the motion. *K-V Pharm.*, 648 F.3d at 592 (citing *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)). It must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor. *Id.* (citing *Digi-Tel Holdings, Inc. v. Proteq Telecommc'ns (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996)).

In determining whether personal jurisdiction exists in this action, the Court first turns to Minnesota's long-arm statute. The statute authorizes an exercise of personal jurisdiction over a nonresident individual who "transacts any business within" Minnesota or "commits any act in Minnesota causing injury or property damage." Minn. Stat. § 543.19, subd. 1 (2015). Ro concedes that because the statute has been interpreted broadly to be coextensive with constitutional limits, the Court's decision hinges on whether an exercise of personal jurisdiction comports with federal constitutional limits. Ro Br. 8 (citing *Minn. Min. & Mfg. Co. v. Nippon Carbide Indus. Co.*, 63 F.3d 694, 696-97 (8th Cir. 1995)); *see also Johnson*, 444 F.3d at 955.

5

Constitutional due process "requires that the defendant purposefully establish 'minimum contacts' in the forum state such that asserting personal jurisdiction and maintaining the lawsuit against the defendant does not offend 'traditional conceptions of fair play and substantial justice.'" *K-V Pharm.*, 648 F.3d at 592 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464, 474 (1985)). The defendant must have engaged in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (quoting *Burger King*, 471 U.S. at 475). "The exercise of jurisdiction satisfies due process when the defendant's contacts with the forum are such that it 'should reasonably anticipate being haled into court there.'" *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 477 (8th Cir. 2012) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). In the Eighth Circuit, courts consider five factors to determine if sufficient minimum contacts exist and whether exercising jurisdiction would comport with fair play and substantial justice: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of [the forum state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Id.* (quoting *K-V Pharm.*, 648 F.3d at 592). The first three factors are treated as primary. *Id.*

The facts recited above show, for purposes of this motion, that Ro has had substantial contacts with Minnesota from both a quantitative and qualitative perspective. In 2012, he accepted employment as a financial advisor for the Minnesota-headquartered Ameriprise. In accepting the job, Ro signed a Financial Advisor Agreement that reflected Ameriprise's ties to Minnesota in several respects, including by stating that the agreement was "made at Minneapolis, Minnesota," and was to be governed by Minnesota law. Halvorson Decl. ¶¶ 3-4.

Although a contract is "not sufficient in and of itself to establish personal jurisdiction," and jurisdiction "does not turn on 'mechanical tests or on conceptualistic theories of the place of contracting or of performance,'" *K-V Pharm.*, 648 F.3d at 593 (quoting *Burger King*, 471 U.S. at 478), a realistic look at the business relationship shaped by the Financial Advisor Agreement supports a finding that Ro has purposefully established minimum contacts with Minnesota. By working as an Ameriprise financial advisor, Ro obtained the benefits of association with, and supervision by, a registered broker-dealer and a member of the Financial Industry Regulatory Authority. *See* Halvorson Decl. ¶ 1. As part of that relationship, Ro agreed to, and did, submit numerous transactions on behalf of his customers to the Ameriprise corporate office in Minnesota for review and approval. Ro could thus offer his clients the comfort of knowing that his advice was backed by and supervised by Ameriprise, and he undoubtedly benefitted from that arrangement. The majority of the applications and orders Ro attempted to place on behalf of his clients were reviewed and approved by Ameriprise in Minnesota, and approximately 2,000 transactions were approved. *Id.* ¶ 7. In addition, Ro communicated regularly with the Ameriprise corporate office regarding his employment and business. He also enjoyed the security of knowing that his work as a registered representative was potentially insured under the Ameriprise-Everest Policy. It is thus clear from the structure and reality of Ro's employment that he relied on Ameriprise's Minnesota-based corporate office's involvement in his business transactions with clients, even if Ro and those clients were not themselves in Minnesota.[2]

---

[2] The quantity and quality of Ro's interactions with the Ameriprise corporate headquarters distinguish this case from one like *Protective Ins. Co. v. Cody*, 882 F. Supp. 782 (S.D. Ind. 1995), where employees working as drivers based out of a remote territory got in an automobile accident and sought benefits under a corporate workers' compensation policy. The drivers in *Cody* took their dispatches from a branch office and merely received paychecks and benefits from, and submitted reimbursement forms to, the corporate headquarters in Indiana, where the court held that it did not have personal jurisdiction. *Id.* at 786-87. Unlike them, Ro

Those contacts with Minnesota, moreover, are sufficiently related to this action that Ro should not be surprised to be haled into this District. Everest alleges that Ro disagrees with Everest's determination that the Policy does not provide coverage with respect to the Underlying Lawsuit. Compl. ¶ 10. As an example, one key issue to be determined in this case is whether the complained-of activity in the Underlying Lawsuit occurred before the retroactive date of the Policy, which coincides with the start of Ro's Ameriprise employment. *See* Compl. ¶ 38. Ro's position is that the complaint in the Underlying Lawsuit alleges objectionable conduct as late as 2013, after Ro had begun his employment with Ameriprise, including an allegation that Ro—acting as Kawasaki's financial advisor through Ameriprise—urged Kawasaki to make certain investments in 2013. Raiter Decl. Ex. E (July 9, 2015 letter from Ro's attorney: "[T]he claims against Mr. Ro can be interpreted as applying to the alleged acts by Mr. Ro in 2012 and 2013."); Davis Decl. Ex. I ¶ 15 (complaint in Ro Lawsuit, noting "alleged wrongdoing by Plaintiff [Ro] occurring in 2013 and allegations involving investments other than the South Korean businesses"); *see also* Compl. Ex. B ¶¶ 51-58 (complaint in Underlying Lawsuit). As discussed above, Ro's activities as an Ameriprise broker relied on the supervision and approval of its Minnesota-based headquarters; Ro contends that those activities are at issue in the Underlying Litigation; and those activities thus relate significantly to this coverage dispute. Although Ro highlighted the connection between the Policy and his employment at Ameriprise in making an argument for coverage, he seeks to hide from it when it comes to analyzing the connections between Everest's declaratory judgment action and Ro's contacts with Minnesota. He cannot have it both ways. Ro purposefully established minimum contacts with Minnesota that gave rise

---

conducted his business based on the reputational strength of, and contingent on the supervision of, a Minnesota-based home office with which he communicated regularly.

to this controversy and thus suffice to establish specific personal jurisdiction. *See Goodyear Dunlop Tires Oper'ns, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (defining specific jurisdiction).

The Court thus concludes that, based on the pleadings and documents in the record before it and under the standards applicable to a motion to dismiss, Everest has established that the Court has personal jurisdiction over Ro in this action. The final two factors in the specific jurisdiction analysis do not affect the result. *Porter v. Berall*, 293 F.3d 1073, 1077 (8th Cir. 2002) ("The final two factors do not help the plaintiffs, since none of the parties are [forum] residents."). Everest argues that Minnesota has a strong interest in disputes over its residents' insurance policies, but the named insured here, Ameriprise, is not a party to the action. As for the parties' convenience, although it may be more convenient for Ro to litigate in Washington, the Court finds that on this record, this factor does not outweigh the otherwise compelling considerations discussed above. *See Burger King*, 471 U.S. at 482-83. Furthermore, convenience may also be appropriately considered in the venue analysis. *See id.* at 483-84.

### B. First-Filed Rule

Satisfied that it has jurisdiction over this action, the Court turns to Ro's second argument for dismissal. The parties acknowledge that there are certain overlaps between this action and the later-filed Ro Lawsuit. Everest asks this Court to apply the so-called "first-filed rule," while Ro asks the Court to disregard the rule and dismiss or transfer this action in deference to the Ro Lawsuit in the Western District of Washington. The Court finds that this case does not call for the application of the first-filed rule and that the interests of sound judicial administration counsel for the transfer of this action.

"Generally, the doctrine of federal comity permits a court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another

9

district." *Orthmann v. Apple River Campground Inc.*, 765 F.2d 119, 121 (8th Cir. 1985) (citation omitted). Consistent with this principle, courts apply the "first to file" or "first-filed" rule in appropriate circumstances. "To conserve judicial resources and avoid conflicting rulings, the first-filed rule gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir. 1993) (citing *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488 (8th Cir. 1990)). Although called a rule, it "is not intended to be rigid, mechanical, or inflexible, but should be applied in a manner serving sound judicial administration." *Orthmann*, 765 F.2d at 121 (citation omitted). The rule "will not be applied where a court finds 'compelling circumstances' supporting its abrogation." *Nw. Airlines*, 989 F.2d at 1006 (quoting *U.S. Fire*, 920 F.2d at 488). Courts are alert to two "red flags" that suggest such compelling circumstances exist: first, if the party that filed the first suit was "on notice" that the other party intended to file its lawsuit imminently, and second, if the first lawsuit was an action for declaratory judgment, which "may be more indicative of a preemptive strike than a suit for damages or equitable relief." *Id.* at 1007 (citation omitted).

Both red flags are raised here. Ro put Everest on notice that he intended imminently to file his lawsuit by telling Everest and Lancer that "Ro intend[ed] to assert a cause of action under [Washington's Insurance Fair Conduct Act] against Everest and Lancer" and citing the applicable statute that required him to provide twenty days' notice, plus three business days if the notice is mailed. Ro Decl. Ex. C 7 (citing Wash. Rev. Code § 48.30.015(8)). The specificity of this notice contrasts with Ro's vague pronouncement in 2015 that he was "considering his legal options," Raiter Decl. Ex. E, offering a much clearer and more definite statement of what cause of action Ro intended to bring and his timeline for filing suit. Although Everest did wait until

10

the expiration of this notice period, the filing of its declaratory judgment action just a few days later (and on a Sunday) has the air of a race to the courthouse. *See Anheuser-Busch, Inc. v. Supreme Int'l Corp.*, 167 F.3d 417, 419 (8th Cir. 1999) (noting that where less than two weeks passed between Supreme's sending of a cease-and-desist letter and the filing of Anheuser's lawsuit, "[t]his short period of time suggests that Anheuser raced to the courthouse"). Everest seeks to counter the appearance of haste by pointing out that Ro had known of Everest's coverage position for two years but sat on his hands like the claimant in *U.S. Fire*. *See* 920 F.2d at 489. While this point has some appeal, it could just as easily be said that Everest was aware of Ro's contrary position for that same period, yet waited to bring its action until after receiving the March 2016 letter asserting that Ro intended to file a cause of action under the insurance statute.[3]

Other considerations combine with these red flags to create compelling circumstances in which it is better to refrain from mechanically applying the first-filed rule. First, the rule applies where there is "parallel litigation," *Nw. Airlines*, 989 F.2d at 1006, and the actions here are not truly parallel. The Ro Lawsuit includes an additional defendant, Lancer, who is not party to this case; in fact, Lancer is not even referenced in this action's Complaint. Moreover, the scope of the allegations in the Ro Lawsuit is broader. Ro alleges that Everest improperly investigated his claim and alleges, among other things, violation of Washington's Insurance Fair Conduct Act, while Everest seeks only a declaration that its conclusion (the denial of coverage)—not its

---

[3] Moreover, unlike in *U.S. Fire*, in which Goodyear unconvincingly claimed to have been misled about the plaintiff's intentions by correspondence about an entirely separate issue, 920 F.2d at 489, during the brief window between the expiration of Ro's notice period and the filing of Everest's Complaint, the parties here were actively engaging with regard to the relevant dispute. In the week or so before filing its Complaint, Everest responded to Ro's March 2016 letter and moved to intervene in the Underlying Lawsuit. Also, the court in *U.S. Fire* noted that "[i]f anything is compelling" in weighing against the application of the first-filed rule there, it was the strong ties to Minnesota where the insurance dispute concerned coverage for punitive damages awarded by a Minnesota jury relating to an accident that occurred in Minnesota. *Id.* at 489 n.7. In contrast, the links between Everest's allegations and Minnesota are not as strong.

investigation—was proper.  Notably, despite having been told that Ro intended to assert a cause of action under the Washington statute, Everest's Complaint does not seek a declaration that Everest did not violate that law.  By noting this difference, the Court does not intend to encourage anyone to add questionably colorable claims to a complaint in an attempt to avoid the first-filed rule.  But here, where Ro had already notified Everest that he intended to assert the statutory claim, and the notice was mandated by statute, it would not serve the interests of justice to decide only the coverage issue in this Court—a decision that could impact the litigation in the Western District of Washington or lead to inconsistent results—while leaving to that other court additional issues like the statutory claim that could have been more efficiently litigated together.

Further, the Court is mindful that the Ro Lawsuit has developed slightly further than this case, with a trial date already set.  Everest also filed an answer in the Ro Lawsuit instead of promptly filing a motion to stay, whereas no answer has been filed in this action.  That progress weighs in favor of deferring to the Ro Lawsuit.  *See Orthmann*, 765 F.2d at 121.  Finally, Everest is already appearing in Washington, both for its intervention in the Underlying Lawsuit[4] and in the Ro Lawsuit.  In contrast, this case is the only reason for Ro to appear in this Court.

In sum, the interests of justice, efficiency, and sound judicial administration support deferring to the Ro Lawsuit.  *See id.*  Given the overlapping causes of action, the Court determines that rather than dismissing this action, it is better to transfer it to the Western District of Washington.  *See ABC Teacher's Outlet, Inc. v. School Specialty, Inc.*, Civ. No. 07-159 (DWF/SRN), 2007 WL 2122660 at *4 (D. Minn. July 17, 2007) (transferring first-filed action to the jurisdiction where the second-filed action was being litigated).

---

[4] The Underlying Litigation has not yet been finally resolved, and the Court does not presume to know the outcome of the upcoming settlement reasonableness hearing in that action.

### C. Improper Venue

Even if the Court were not transferring this action in deference to the litigation in Washington, it would transfer it pursuant to 28 U.S.C. § 1406(a) for improper venue under 28 U.S.C. § 1391. The question turns on whether § 1391(b)(2) applies.[5] That provision states that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." Analyzing whether this requirement is met differs from the personal jurisdiction analysis. *Steen v. Murray*, 770 F.3d 698, 703 n.3 (8th Cir. 2014) ("A defendant may be subject to personal jurisdiction in a venue that is nonetheless improper because a substantial part of the events or omissions giving rise to the claim did not occur in that district.") (citation omitted); *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) ("It would be error . . . to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries.") (citations omitted).

In the Eighth Circuit, courts determining whether § 1391(b)(2) applies in a given case must "focus on relevant activities of the defendant, not of the plaintiff." *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995). The purpose of this focus is to protect defendants from being "haled into a remote district" having a more tenuous relationship to the dispute. *Id.* (citation omitted). The court may consider other relevant facts, but the focus must be on "the defendant's allegedly wrongful activities." *Steen*, 770 F.3d at 703. Although the district need not be "the 'best' venue," a substantial part of the events giving rise to the claim must have occurred there. *Id.* at 702 (quoting *Setco Ent. Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994)). In *Steen*,

---

[5] Everest only asserts that venue is proper under 28 U.S.C. § 1391(b)(2). Compl. ¶ 21. This concession was wise, because the other two subsections appear inapplicable. There is no indication that Ro resides in—*i.e.*, that he is domiciled in—Minnesota. 28 U.S.C. § 1391(b)(1), (c)(1). And because this case could be litigated in the Western District of Washington, *see infra* p. 16, § 1391(b)(3) does not apply.

the appellate court distinguished between the defendants' wrongful acts, which all took place outside the jurisdiction where the complaint was filed, and their acts within the district that simply had a "but for" connection in that "the alleged wrongful conduct would have been impossible without the event." *Id.* at 704 (citation omitted). The fact that "the alleged wrongful activity [] occurred exclusively in" another district supported the conclusion that a substantial part of the events or omissions giving rise to the claim occurred in that other district and that the within-district events or omissions were not substantial for venue purposes because they were only causally-connected, but not wrongful, activity. *Id.*

The question is not an easy one in insurance coverage disputes. Everest correctly notes that with this type of case, there is a nationwide divergence of opinion over where a substantial part of the events giving rise to the claim occurred. One district court noted that "[s]ome courts have focused on the underlying events for which coverage is sought," "[o]thers have looked to factors such as where the contract was negotiated or executed, where it was to be performed, or where the alleged breach occurred," and others have found that either set of facts could support venue. *Malveaux v. Christian Bros. Servs.*, 753 F. Supp. 2d 35, 39 (D.D.C. 2010) (citing cases). The Court of Appeals for the Second Circuit appears to fall in the last camp. In *Glasbrenner*, it held that where an insurance policy was submitted, approved, and issued in the district *and* the claimants had appeared in bankruptcy court in the district in a related matter, venue was proper in that district, but it also recognized that where "the original injury, the trial [in the underlying lawsuit], and the underlying judgment" occurred in a different district, venue would be proper there too. 417 F.3d at 357-58. It "explicitly decline[d] to decide . . . whether the negotiation and issuance of a contract in a given judicial district, standing alone, is sufficient to lay venue in that district." *Id.* at 357 n.2. The Courts of Appeal for the First and Tenth Circuits have each found

venue to be proper where the claimed loss occurred, but did not decide whether venue could also be proper in other districts based on other facts. *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167 (10th Cir. 2010); *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 43 (1st Cir. 2001). These courts recognize that the Eighth Circuit applies a narrower focus in its venue analysis, *Bartile*, 618 F.3d at 1166 n.11; *Uffner*, 244 F.3d at 42 n.6; but their holdings nonetheless provide helpful context in considering whether venue is proper in this case.

The parties do not cite, and the Court has not found, any closely analogous cases in this circuit to provide guidance. Applying the general Eighth Circuit venue principles discussed above, however, makes clear that in this case, no substantial events or omissions occurred in the District of Minnesota. Although the Policy was issued in Minnesota to a Minnesota-headquartered insured, *see* Compl. ¶¶ 25-26, that event was merely "a necessary event, in a causal sense," in the chain of causation leading up to this insurance dispute, but is not "an event giving rise to [this dispute] because it was not itself wrongful"—nor, in fact, was Ro even involved in the issuance of the Policy. *Woodke*, 70 F.3d at 985-86. Similarly, although Ro was employed by the Minnesota-based Ameriprise and interacted with its home office pursuant to his employment, *see supra*, those acts are not the "wrongful" events that gave rise to Everest's lawsuit. It is true that had Ro not been employed by Ameriprise, he would not have been able to make a claim under the Policy, but "an event does not 'give rise to the claim' simply because the alleged wrongful conduct would have been impossible without the event." *Steen*, 770 F.3d at 704. Rather, Everest alleges that Ro has incorrectly ("wrongfully") sought coverage under the Policy for his losses in defending the Underlying Lawsuit. But the Underlying Lawsuit was litigated—indeed, is still active in—Washington state court, and Ro has made his claims under the Policy from his Washington residence. Ro reiterated his position through counsel in letters

15

sent from Washington, and Lancer reinforced its position through reply letters sent to Ro in Washington.  *See, e.g.*, Raiter Decl. Exs. C & D (letters from Lancer to Ro), E & H (letters from Ro's counsel in Washington to Lancer/Everest in California/New Jersey).  Ro's acts in the Western District of Washington are the substantial events giving rise to Everest's declaratory judgment action.  *Cf. Sterling Wholesale, LLC v. Travelers Indem. Co. of Conn.*, Civ. No. 12-60500, 2012 WL 1991456, at *2 (S.D. Fla. May 29, 2012) (where the defendant was the insurer, looking to "the alleged wrong committed by [the insurer]," meaning "the denial of coverage and the failure to indemnify or defend" the claimant in underlying litigation in another district) (applying an Eleventh Circuit opinion that adopted the *Woodke* analysis).  The acts in Minnesota, by contrast, are not substantial for venue purposes under Eighth Circuit precedent.  Therefore, venue in the District of Minnesota is improper.  The Court finds that it is in the interest of justice to transfer this action to the Western District of Washington.  28 U.S.C. § 1406(a).

### D. Motion to Transfer Pursuant to § 1404(a)

Ro alternatively moves for transfer pursuant to 28 U.S.C. § 1404(a).  Because the Court grants the motion to transfer on the grounds set forth above, it does not reach this question.

### III. Conclusion

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant's Motion to Dismiss or Transfer [Dkt. No. 9] is GRANTED as to the motion to transfer.

2. The Clerk of Court is DIRECTED TO TRANSFER this action to the United States District Court for the Western District of Washington (Seattle).

Dated: July 26, 2016

                                                s/ Joan N. Ericksen
                                                JOAN N. ERICKSEN
                                                United States District Judge